PHILADELPHIA TRUST, SAFE DEPOSIT & INS. CO. (CORN EXCH. NAT. BANK v.). See Case No. 3,244.

PHILADELPHIA, W. & B. R. CO. (DUBOIS v.). See Case No. 4,109.

PHILADELPHIA, W. & B. R. CO. (MINOT v.). See Case No. 9,645.

PHILADELPHIA, W. & B. R. CO. (PHILADELPHIA & HAVRE DE GRACE STEAM TOW-BOAT CO. v.). See Case No. 11,085.

---

## Case No. 11,091a.

### The PHILAH.

[5 Adm. Rec. 693.]

District Court, S. D. Florida. June 8, 1857.

SALVAGE—COMPENSATION—SAVING BOTH VESSEL AND CARGO—VALUE OF PROPERTY SAVED.

[1. Greater compensation should be awarded for saving vessel and cargo from imminent peril of total loss than for saving the cargo alone.]

[2. Other things being equal, the ratio of the salvage award to the value of the property saved should be less when such value is large than when it is small.]

[This was a libel for salvage by Michael McNamara and others against the bark Philah and cargo.]

S. R. Mallory, for libellants.

S. J. Douglas, for respondent.

MARVIN, District Judge. This bark, laden with cotton and tobacco, and bound on a voyage from New Orleans to Gottenberg, on the night of the 6th of May last ran ashore upon a reef known as "Flap Jack Reef," near the Tortugas Islands. At daylight the master sounded around his vessel, and prepared to run out his anchors. Soon after libellants arrived and offered their assistance, which was declined by the master, who hoped to be able to heave his vessel off at high water. He ran out his anchors and tried faithfully to heave his

vessel off during two tides, or twenty four hours, but without any success. At the end of this time his vessel had sprung a leak. She had three feet of water in her. She lay in nine and ten feet water, drawing fourteen. The wind was blowing fresh on the reef, and the master had no further hopes of saving his vessel and cargo, without assistance. He accepted the assistance of the libellants. They lightened the vessel of one hundred and seventy bales of cotton. Carried out one of their own anchors, and heaved the vessel off, which, however, leaked so badly as to require sixteen of the salvors to continue constantly at the pumps, until their arrival in this port on the ninth. It appears from the report of surveyors, that the bark was much injured on the reef, having lost nearly her entire keel and sustained other serious injuries. A hole, about four by six inches in size, had been cut through the planks of the ship by the rocks into which mud had worked, so as in part to fill it. Under these circumstances, it is very clear, that the master could not have saved this ship or cargo, and that the libellants have saved them from total loss. And the principle applies, that where a stranded ship has been saved from imminent peril as well as the cargo by energy and exertions of salvors, the salvage ought to be greater, other things being equal, than where the vessel is lost and the cargo only saved. There are three reasons for this rule. First. Where the vessel is lost there is usually a large loss of property, and owners and underwriters cannot so well afford to pay a large sum of money for saving the residue. Second. When the vessel is lost there is a less sum to award salvage out of. Third. The rule makes it the interest of the salvors to exert themselves to save the ship. I regard the salvors, therefore, as standing, in the present case, in the highest mark of merit except perhaps cases of derelict.

The course of argument adopted by the libellants' advocate on the hearing makes it very proper for the court, in the present case, to advert to the principles, or some of them, upon which salvages are determined in this court, and to fortify the opinion delivered in the case of The Courier A. R. [Case No. 3,-283], with some authorities not there referred to. The rule of fixed proportions, or of giving one uniform proportion of the value in all cases for salvage is unjust and impolitic in itself, for where the value is small the salvage would be insufficient to pay for the work and labor, unless the rate or proportion fixed was high, as one quarter, or a third or a half, and then the salvage would be unreasonably high, where the value was large. If you alter the proportion or rate according to differences of value, then you virtually discard all ideas of a proportion, and fix the amount of salvage upon other considerations which, when so fixed, may be, and often is, expressed, in the decrees of the courts, in the form of a proportion. And such, I think, is the law in England and the United States. "The maritime

laws of England," says Sir Edward Simpson, "fix no certain proportion in cases of salvage, but are governed by circumstances of danger, hazard, trouble and expenses of saving. An eighth or tenth, except in cases of extreme hazard, is as much as is usually allowed. In some cases of extreme hazard, one third of the value, or one fourth, or one sixth or one ninth, or a sum of money only, on account of danger, is given." The H. M. S. Thetis, 3 Hagg. Adm. 62. "The rates of simple proportion graduate at large intervals, while the estimate of services, labor and enterprise requires to be made as minutely as possible under an infinite variety of particulars, and may, therefore, be better done by the allowance of precise sums." The Oscar, 2 Hagg. Adm. 260. "The principle of giving specific proportions of the property saved, is an inconvenient rule in itself, and must lead to error, unless checked by proper attention to the adequacy of the remuneration so assigned according to the circumstances of the particular case." The Vesta, Id. 194. "The allowance of a specific proportion of the property saved has not been of late years much practiced in England, or, so far as cases are reported, in this country." Hennessey v. The Versailles [Case No. 6,365]. "Where the salvage is below an eighth, it is usual to adjudge a compensation in numero." [The Adventure] 8 Cranch [12 U. S.] 221. In The Huntress the district court [Case No. 6,912] had decided a quarter of the value of the property saved. On appeal the circuit court [Id. 11,971] reversed the decision, noticed the particular facts of the case, and the number of the salvors, and gave a "liberal remuneration" and assigned to each salvor a specific sum. In the case of The Brig Spes [unreported] and in the case of The Champion [Id. 2,582a], two cases of salvage services rendered by pilots in towing the vessels into port, lately decided in the district court of New York, Betts, Judge, the court is reported to have said: "That a proper compensation for the labor, exposure, and cost incurred by them is the foundation upon which their reward must be computed, and that twenty dollars an hour is such compensation." In one case, the value was $30,000. The value in the other is not reported. In both, the salvors were paid by the hour. Where the value of the property is small, and the hazard is great, the allowance is always in greater proportion. On the other hand, where the value is large and the services are highly meritorious, the proportion is less. Tyson v. Prior [Case No. 14,319]. "The court gives a smaller proportion where the property is large, a larger where it is small, and a moderate proportion where it is of vast extent." The Blendenhall, 1 Dod. 414–423. Now, if the proportions vary in this manner,— and they must vary, for you would not give the same amount to a salvor for pointing out a channel that you would for bringing in a derelict,—if salvage is a compensation, a remuneration, as it is constantly called; if

specific proportions are inconvenient, if precise sums are better, if specific proportions lead to error unless checked by the proper attention to the adequacy of the remuneration, if, where the salvage is below an eighth a sum in numero is given, or a sum of money only on account of salvage,—what is all this, but an utter disclaimer of all idea of graduating salvages according to any scale of proportions? An utter and entire disregard of rates or proportions? It is an easy matter, and would not require much intelligence nor the exercise of much judgment to award a quarter, a third or a half in the cases as they occur, without considering very much what the salvage would amount to, or what compensation it would really give. Such decision Cleirac calls a "judicium rusticum" (Bearse v. Three Hundred and Forty Pigs of Copper [Case No. 1,193]), and is just such as the courts of England and the United States have constantly condemned while they have acted on the principle of decreeing a liberal remuneration for the enterprize, hazard, labor, skill of the salvors—increasing the remuneration where the value is large, and vice versa but not according to any definite scale or rates of increase or decrease. Such increase being given with the increased value, not only because it affords the court an opportunity of doing what in many cases it cannot do, i. e. of giving an adequate remuneration. However great the value, the salvage is to be simply an adequate remuneration. 1 Hagg. Adm. 246; 3 Hagg. Adm. 93, 221. In Hand v. The Elvira [Case No. 6,015], Judge Hopkinson, after an elaborate exposition of the whole law of salvage, says: "If the salvor has afforded his assistance in a proper spirit, he will be satisfied with a just and fair remuneration for the labor, hazard, and expense, he has encountered in the service, and it is only a proper spirit that we should seek or desire to satisfy. To this measure of compensation the judge, governed by a liberal policy, will add a reasonable encouragement, which the generous and humane will hardly need to prompt men to exertions to relieve their fellow men in danger and distress. But we must remember, that the policy of the law is not to provoke or satisfy the appetite of avarice, but to hold out an inducement, to such as require it to make extraordinary efforts to save those, who may be encompassed with perils beyond their own strength to subdue." And what does our supreme court mean, when it says, that where the salvage is below an eighth, it is usual to adjudge a compensation in numero; and the high court of admiralty, when it speaks of a sum of money being on account of salvage? I think they mean to say, that in very many cases, where the value of the property is large and the services are inconsiderable, that an adequate remuneration in a round sum is given the salvor, without a very special regard to the precise value of the property saved, though the magnitude of the value is not wholly lost sight of. The importance of the value, in such cases, as an ingredient in fixing the salvage, diminishes as the value augments, and the labor and trouble of the salvor diminishes. There are numerous cases in the books, where salvage services have been remunerated with but very little regard to the value of the property involved, so far as the reports show. Touching the manner in which the value of the property is ascertained in salvage causes, it may be remarked, that an appraisement is very rarely resorted to in the English admiralty courts, or in the American courts, so far as the cases are reported. By the practice in the English admiralty, the salvors allege, in their act or petition, or in a separate affidavit, what they consider the value to be, and the owners or claimants state what it is, under oath. With this statement the salvors are usually satisfied. If not, they sue out a commission of appraisement at the peril of paying costs. In the case of The Persian, 1 W. Rob. Adm. 328, the owners stated the value to be £1,800, the salvors sued out a commission of appraisement, and the commissioners returned the value to be £1,780. The court said: "In cases of salvage, unless there be a very great disparity between the value stated on the part of the owners and the actual value of the property, the court is greatly disposed to discountenance the measure of taking out a commission of appraisement. Whenever such a commission is taken out, and it ultimately appears that the party taking out the commission has done so in error, the court will enforce the rule, that the party so proceeding shall pay the costs which may be occasioned to the other party." I think the English rule upon this subject ought to prevail in this court, as it is in harmony with the rules of our admiralty courts and with good sense, and that the libellants ought to state in their libel what the property consists of, and their estimates of its value, and the claimant, in like manner, ought to respond under oath, and, unless there is a very great disparity between the values as stated by the respective parties, an appraisement ought not to be granted. Nor ought it to be granted where the value is known and admitted to be very large and the services are inconsiderable; for in such a case, an adequate remuneration can be made by the court without a knowledge of the precise value, and the interest of the salvor in any increased value or of the owner in any increased salvage, upon the principle above stated, becomes so attenuated and minute as to be no longer practically appreciable, de minimis non curat lex. Nor when, the quantity and quality being known, the value may be ascertained by calculation; nor in brief, in any case where it is unnecessary to a just and legal decision of the cause

To return to the case in hand, the principle

of an adequate remuneration, rather than a proportion being established, it is proper to take into consideration all the circumstances of the case, the value of the property and its peril, risk, labor, and enterprize of the salvors, their character and number, their occupations in life, the size and value of their vessels. the policy of the law in giving salvages, that policy as applicable to this coast, how far and to what extent the necessities of commerce require that persons should be encouraged to engage in the business, as a business, of saving wrecked property, the adequacy of the shares of the several salvors, as a remuneration, in any sum proposed to be given as the total salvage, and other pertinent considerations. This case, in its principal features of peril to the property, its value, the risk, labor, and number of the salvors, is like many others decided in this court. In The Ann Hood [unreported] the value was $61,306; salvage, $18,498; men, 66; shares, $123. The M. Hawes [unreported], value, $42,800; salvage, $12,840; men, 66; shares, $97. The Emily Taylor [unreported], value, $81,168; salvage, $16,233; men, 63; shares, $128,—in The Emporium [unreported], $150; in The Alleghany [unreported], $180; and in The Mississippi [Case No. 9,650], valued at $100,000, the shares were $188,—being the largest shares known in the history of the court. These cases all rank in the highest class of merit, and the salvages are among the largest decreed by this court. Vide other cases collected in The John and Albert [Id. 7,333]; The Pilgrim [Id. 11,166]; and The Crown [Id. 3,450], lately decided. In the present case, the ship has been sold for $1,701.39, and the cargo has been valued at $68,685.77, making the total value $70,387.16. Four large wrecking vessels and one smaller one having an aggregate tonnage of two hundred and twenty six tons, and thirty six men, were employed in rendering the salvage services. I think one quarter of the net value is a reasonable salvage. It will make the total salvage not far from $17,000, and the men's shares between $170 and $180.

The facts and circumstances of this case being fully heard and understood, and mature deliberation had, it is now ordered, adjudged, and decreed, that the libellants have and recover in full compensation for their services in saving the said bark and cargo from total loss, the one quarter of the net value thereof, after first deducting the costs and expenses of this suit, the wharfage, storage, labor bills, in storing and landing the same, the merchants' commissions, the master's compensation for his services in taking care of the ship and cargo in this port, and reshipping the cargo,—and that it be referred to the clerk to ascertain and report the aforesaid costs and charges, and to apportion the salvage herein allowed and the costs and charges properly apportionable between the bark and cargo, and show the

amount of salvage and expenses to be paid by each,—and that upon the confirmation by the court of his report a final decree be entered in the premises.

And afterwards, on the 15th of June, 1857, aforesaid, the judge made and filed in the said clerk's office his final order, and decree, in the case, in the words and figures following, to wit:

The clerk having reported to the court the costs, expenses and charges upon the bark and cargo, in pursuance of the decree heretofore pronounced in this case, whereby it appears that the total salvage, costs, and charges, including seamen's wages, upon the ship amount to $1,272.01; that the ship sold for $1,701.39, leaving a balance in court to be returned to the master of $429.38. And that the total salvage, costs, and charges upon the cargo amount to $20,433.56; that there has been sold of the cargo, damaged cotton and tobacco amounting to $5,371.41, leaving as a balance still to be paid on account of the cargo $15,062.15,—it is now ordered and decreed, that the libellants recover for their salvage the sum of $16,614.80, being the one quarter of the value of the ship and cargo, after deducting the costs and charges; that the master pay to the marshal the further sum of $15,062.15, on account of the salvage, costs and charges upon the cargo, and that, upon the payment thereof, he restore said cargo to Captain Spofford on account of whom it may concern; that the clerk return to Captain Spofford the sum of $429.38 on account of the residue of the proceeds of the sale of said bark; that the clerk also pay to the several persons entitled thereto the bills of costs and charges allowed by the court.